UNITED STATES of America, Appellee,

v.

MOORE–McCORMACK LINES, INC., and Indemnity Insurance Company of North America, Appellants.

No. 8581.

United States Court of Appeals Fourth Circuit.

Argued May 29, 1962.

Decided Sept. 29, 1962.

J. Franklin Fort, Washington, D. C. (Frank B. Ober, Southgate L. Morison, Baltimore, Md., Israel Convisser, Washington, D. C., Ober, Williams, Grimes & Stinson, Baltimore, Md., and Kominers & Fort, Washington, D. C., on the brief), for appellants.

Lawrence F. Ledebur, Atty., Dept. of Justice (William H. Orrick, Jr., Asst. Atty. Gen., Joseph D. Tydings, U. S. Atty., and Morton Hollander and Leavenworth Colby, Attys., Dept. of Justice, on the brief), for appellee.

Before SOPER, HAYNSWORTH and BRYAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The Maritime Administrator and some subsidized American shipping companies, which were also charterers of government-owned vessels, have differed over the computation of additional charter hire for the chartered vessels. Preliminary phases of the controversy, as it affects other shipping companies, have been considered by the courts,[1] but this is the first case to present the merits for decision. This controversy comes to us now on an appeal by Moore-McCormack Lines, Inc. and its surety from a judgment of the District Court awarding the United States $592,088.44 as additional charter hire, together with interest thereon.[2] The amount in actual controversy, however, is only half the amount of the award, for if the shipping company is not liable for the additional charter hire claimed, the parties agree it has been overpaid in operating differential subsidy in an amount equal to fifty per cent of the additional charter hire claim.

The dispute revolves around the method of computation of profits in the operation of the chartered vessels. Moore-McCormack contends, in effect, that no additional charter hire is payable because there were no net profits resulting from the operation of the chartered vessels during the period of the charter if that period is viewed as a whole. The United States, on the other hand, contends that additional charter hire must be computed and paid with respect to profit realized in profitable years and that losses in the other years from the chartered operations cannot be used to reduce or offset the profit in earlier profit years. Decision turns upon an interpretation of § 709(a) of the Merchant Marine Act of 1936, which provides no clear or certain answer. The District Judge construed it as the government construes it, and that construction is certainly not impermissible, but, for the reasons which presently will appear, we think, properly construed, the statute and the charter require the computation of profits and losses, for the purpose of a final determination of additional charter hire, on the basis of the charter period rather than upon the basis of segmented, calendar years falling within the charter period.

1. See, e. g., American-Foreign Steamship Corporation v. United States, 2 Cir., 265 F.2d 136, rev. 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491, opinions on remand, 2 Cir., 291 F.2d 598; American Export Lines, Inc. v. United States, Ct.Cl., 290 F.2d 925.

2. United States v. Moore-McCormack Lines, Inc., D.Md., 199 F.Supp. 522.

By § 101 of the Merchant Marine Act of 1936,[3] Congress declared its purpose to foster the development and encourage the maintenance of a merchant marine composed of safe and well-equipped vessels constructed in the United States, manned and owned by American citizens and operated under the flag of the United States, which would be sufficient to carry all of the domestic water borne commerce and a substantial part of the foreign water borne commerce of the United States, and which, in time of war, would be capable of serving as a naval and military auxiliary. To further those general purposes, the Congress, among other things, provided for the subsidization of construction of ships in American shipyards and the operation of qualifying vessels on prescribed routes. Generally, the operating differential subsidy was to be computed on the basis of the difference in the cost of operating the American vessels and related facilities and the cost of operation of foreign flag vessels in competition with them. Provision was made, however, for the recapture of operating differential subsidy payments to the extent of fifty per cent of the profits from the subsidized operations if and to the extent that those profits exceeded ten per centum per annum of the capital necessarily employed in the subsidized operations.[4] The Congress, however, was well aware of the cyclical nature of the shipping business and the necessity of accumulation of profits in profitable years to offset losses in poor years. It, therefore, provided that the operating differential subsidy recapture provision operate finally with respect to periods of more than twelve months. While annual accountings were required, profits subject to partial recapture were to be computed over a five-year period as originally enacted, and the period of this computation was enlarged by amendment in 1938 to ten years. Thus the computation of profits for the purpose of recapture of operating differential subsidies is based upon an averaging of profits over a ten-year period, and the recapture provision is inoperable if substantial profits in some years are offset by losses in other years within the same ten-year period.

In further implementation of its declared purpose, the Congress provided for the chartering of vessels owned by the United States to private operators.[5] The charter was to go to the qualified bidder proposing the highest monthly charter hire, and operating differential subsidy contracts were authorized with respect to the operation of the chartered vessels upon the same terms as for the operation of privately owned vessels. As with respect to the subsidy payments, however, the Congress contemplated the possibility that operation of the chartered vessels might produce unusual profits, and so it embodied in the Act a provision for additional charter hire equal to fifty per cent of the cumulative net voyage profits of the operation of the chartered vessels after a deduction of an amount equal to ten per centum per annum of the capital necessarily employed in their operation. Section 709(a) of the Act,[6] embodying the additional charter hire provision, is in the following language:

"(a) Every charter made by the Secretary of Commerce pursuant to the provisions of sections 1191–1204 of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Secretary, as additional charter hire, one-half of such cumulative net voyage prof-

3. 46 U.S.C.A. § 1101.

4. See § 606 of the Act, 46 U.S.C.A. § 1176.

5. See § 704 et seq. of the Act, 46 U.S.C.A. § 1194 et seq.

6. 46 U.S.C.A. § 1199.

it in excess of 10 per centum per annum: *Provided*, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

Under these provisions of the Act, Moore-McCormack first chartered the government-owned vessels, SS Uruguay, SS Argentina and SS Brazil, known as the "Good Neighbor Fleet," in 1938. During the Second World War, the operation of these vessels by Moore-McCormack was suspended, but was resumed in 1948. In July 1951, the charter under which Moore-McCormack had been operating its vessels having expired, it became the charterer of the same vessels under a new charter, having been the successful bidder for it. This bare boat charter was for an initial period of three years, but the period was later extended with respect to two of the ships. The charter provided for the payment of basic charter hire of $22,000 per month per vessel, or $792,000 per year for the three vessels. In accordance with the requirement of § 709 of the Act, the charter contained a provision for additional charter hire, which is quoted in the margin.[7]

In 1951 Moore-McCormack's subsidy agreement was also amended to require the operation of these three vessels with not less than twenty-four nor more than twenty-six sailings each year between New York and the East Coast of South America. That agreement obligated Moore-McCormack to operate the vessels through the year 1957 and, on demand, to replace them with suitable new vessels.

The SS Uruguay was redelivered to Maritime on April 27, 1954, pursuant to an amendatory agreement, the Brazil on December 27, 1957, and the Argentina on August 22, 1958. In 1958, Moore-McCormack placed in service new replacement vessels, which, with the aid of construction subsidy, it had caused to be constructed.

Final determination of all items entering into a calculation of net voyage profits must await the settlement and adjustment of many matters. While preliminary accountings were submitted in accordance with Clause 6(b) of the charter,[8] Moore-McCormack's final accounting for 1951 was not settled and approved by Maritime until November 7, 1958. The accounting for 1952 was approved on December 19, 1958 and the Company's final accounting for 1953 was not submitted to Maritime until February 17, 1959. By the time of trial, however, final accountings had been audited and approved through those for the year 1956. That for the year 1957 is still unaudited, and there is uncertainty as to whether the

7. "Clause 6. *Additional Charter Hire.* (a) If at the end of the calendar year 1951, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum of the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined), the Charterer shall pay over to the Owner at Washington, D.C., within thirty (30) days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to one-half of such cumulative net voyage profit in excess of 10 per centum per annum of the Charterer's capital necessarily employed in the business of the Vessels but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period.

"(b) The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire at such times and in such manner and amounts as may be required by the Owner; *provided* however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."

8. See footnote 7, supra.

operations of the chartered vessels during 1957 resulted in a net loss of $1,231,105.74, as disclosed by the last accounting for that year, or a profit of approximately $157,929, as represented to the District Court on the basis of Moore-McCormack's latest figures. The earlier years, however, disclosed net voyage profits and (losses) as follows:

| 1951 | $ 609,236.25 |
|------|--------------|
| 1952 | 760,193.77 |
| 1953 | (2,066,962.82) |
| 1954 | (1,460,665.79) |
| 1955 | (1,283,257.12) |
| 1956 | (1,303,747.35) |

The only profits in the relevant years, assuming no profit in 1957, were realized in 1951 and 1952. In 1951, the allowable return of ten per cent of the capital employed in the charter operation was $53,097.66, so that, of the net voyage profit of $609,236.25, some $556,139.59 was excess and subject to possible division. The allowable return in 1952 was $132,155.50, which, subtracted from the net voyage profit of $760,193.77, leaves an excess profit of $628,038.27, subject to possible division.

It is clear, however, that Moore-McCormack's charter operation over the life of the charter resulted in a very substantial loss. The loss in 1953 alone was greater than the total combined profit realized in 1951 and 1952, before reduction of allowable return. The losses in the succeeding charter years swelled the cumulative loss to an amount far in excess of any nominal profit that might have been earned in 1957.[9] Thus, it is apparent that while the charter operations over the life of the charter resulted in substantial net losses to Moore-McCormack, it had net profits in 1951 and 1952. If, as the Government contends, we look only to the results of the operations in the profit years, the additional charter hire of $592,088.44 is due. On the other hand, if we are to look to the results of the charterer's operations over the life of the charter, there were no profits subject to

division under the provision for additional charter hire.

These computations of profits and losses were made only after the computation of subsidy. In computing subsidy here, the Government's claim of additional charter hire was treated as a liability. Adjudication that Moore-McCormack is not required to pay the additional charter hire claimed will result in a recomputation of its subsidy, with the result that one-half of the amount claimed as additional charter hire will become payable to the United States as an overpayment of subsidy, or as recoverable under the recapture provision of § 606.

The statute requires the payment of additional charter hire "whenever, at the end of any calendar year, subsequent to the execution of such charter, the cumulative net voyage profits * * * shall exceed 10 per centum per annum * *: Provided, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profits in subsequent years."

■ The crucial words are "cumulative net voyage profits." Use of the word, "cumulative" indicates an intention that profits and losses shall be cumulated over the life of the charter, just as profits and losses are cumulated over a fixed period of years for purposes of the closely related subsidy recapture. If that is not the import of the word, its use was wholly unnecessary and the entire proviso is both unnecessary and redundant.

■ The United States contends that, because accounting on the basis of each completed round voyage is traditional in the shipping business, use of the word "cumulative" was necessary to show that additional charter hire is to be computed on the basis of the results of all voyages completed during the calendar year, rather than upon a voyage by voyage basis. The conclusion does not flow from the premise, however. Completed voyages as a method of accounting may be traditional in the shipping business, as completed

9. It is the Government's position that no profit for 1957 has been proven, and that, for our present purposes, it must be assumed that 1957 was a loss year.

contracts are a traditional method of accounting in the construction industry. Since annual accounting is clearly required, however, "net voyage profits" means no less than "net profits during the year computed on the basis of a completed voyage method of accounting." Whatever the accounting method and whether it be traditional or requisite, or both, the term "net profits," without qualifying words but used in connection with a requirement of annual reporting, is quite sufficient to require an aggregation of the results of all voyages or other transactions which, under the method of accounting employed, are properly allocated to the year of the report.

Use of the word "cumulative" is not inconsistent with the purpose suggested by the United States, but it imports something more. That it was so intended is further suggested by the fact that reference to the execution of the charter immediately precedes the word "cumulative." The natural reading is that the period of cumulation commences with the execution of the charter and extends to "the end of any calendar year, subsequent to the execution of such charter  *  *."

Thus read, all of the words of the statute may be given effect and harmonized. If at the end of the first year after execution of the charter, excess profits are disclosed, a payment on account of additional charter hire is required. If at the end of the second year further cumulative excess profits from the charter operations are disclosed, though, on the basis of the latest figures, all or most of the profit was attributable to the first year, a further payment on account is required, but then the proviso operates to prevent a pyramiding of profit in the computation of additional charter hire.

This interpretation of the statute would treat each annual report and each

payment on account of additional charter hire as tentative, for what, if any, additional charter hire ultimately will be found to be due, cannot be determined until after expiration of the charter. Clause 6(b) of the charter, however, specifically provides that they are. Payments of additional charter hire are preliminary and subject to adjustment until the rendition of a preliminary statement or the completion of a final audit, at which time the charterer must pay such additional charter hire as may be due and any overpayment will be refunded to the charterer "as may be required." [10]

This reading of the statute is consistent with prescribed procedures for subsidy recapture. There, it is plain that there is no recapture of subsidy unless profits, computed over a ten-year period, exceed ten per centum per annum of the capital necessarily employed in the subsidized operations. During the ten-year period, however, if profits exceed ten per centum per annum, the excess, annually or more frequently, must be deposited in a restricted special reserve fund.[11] Withdrawals from the special reserve fund may be made to reimburse the contractor's general funds for losses in later years and to pay to the United States such sums as may be later found to be due under the subsidy recapture clause of § 606. The effective result is tentative annual accounting of subsidy return and a segregation of funds to cover the obligation of repayment when the amount of the requisite repayment is finally determined sometime after the expiration of the ten-year period. That arrangement is comparable to the requirement of § 709(a), as we read it, of tentative annual reports and payments on account of additional charter hire, subject to final determination and adjustment after expiration of the charter when the cumulative net

10. The final audit to which Clause 6(b) of the charter refers, may well be one final audit of all operations under the charter made after its expiration. On the limitations question, that was the position of the shipping companies in the cases reported sub nom. American-Foreign

Steamship Corporation v. United States. And see Maritime's circular letter quoted by Judge Hincks in footnote 4 of his opinion for the majority of the first en banc court, 265 F.2d at 145.

11. See § 607(c) of the Act.

voyage profits, over the life of the charter, have been calculated.

It is clear that the term "cumulative net profits" was used in § 607(b) in the sense in which we read it, for there are the added words "from the date the contract was executed." If it may be said that § 709 contains no comparable words "from the date the charter was executed," there is no internal evidence that the Congress was using the word "cumulative" to mean only an aggregation of the results of voyages completed during a single calendar year. The legislative history indicates that "cumulative" was not intended to have that restricted construction.

There is no conclusive legislative history. There were earlier bills, however, providing for subsidy and subsidy recapture, and some of them provided for chartering government-owned vessels and payment of additional charter hire based upon a computation of the charterer's net profits. Indeed, § 47 of the committee print of March 30, 1936 of S. 4110 [12] contains the identical language which ultimately became § 709. That Bill's provision for subsidy recapture, quoted in the margin,[13] was strikingly comparable. S. 4110, as originally introduced, also provided for subsidy recapture based upon a division of "cumulative net profits."

In the hearings on these and earlier bills, there had been much emphasis upon the cyclical nature of the shipping business. Members of the Congress expressed the decided opinion that shipping companies should be allowed to offset profits in good years against losses in the poor years. It was continuing concern on that score which led to the enlargement in 1938 of the period of computation of profits, subject to division under subsidy recapture, to ten years.

Mr. J. C. Peacock, the Director of the Shipping Board Bureau of the Department of Commerce, appeared as a witness in hearings held by the Senate Committee on Commerce on March 9 and 10, 1936 on S. 3500, S. 4110 and S. 4111. Asked about the terms "cumulative net profits" and "cumulative profits" as used in S. 3500, Mr. Peacock responded:

"After that, and after the reserve, if the *cumulative net profit* at any year, after setting aside those reserves, exceed 10 per centum upon the company's true investment, if I recall rightly, from then on, at the end of 5 years 50 per centum of such *cumulative profits* in excess of said reserves shall be paid to the Authority."

A bit later he responded as follows:

Senator Gibson. "Then it would be on a cumulative profit basis?"

Mr. Peacock. "Yes. Which would reflect the losses in the intervening years, too."

Maritime has consistently interpreted the word "cumulative" to permit a combining of the results of operations of more than one year, at least when the loss year precedes the profit year.

The question first arose with respect to Moore-McCormack's operation of these

---

12. 74th Cong., 2d Sess., February 24 (calendar day, February 27), 1936, introduced by Senator Guffey.

13. "Sec. 35. To safeguard the public interest in the administration of the operating-differential subsidy, every contract executed under this title shall contain provisions requiring * * * (3) that when at the end of any calendar year subsequent to the first payment of any sum as operating-differential subsidy to any operator, the cumulative net profits of said operator, after deducting depreciation charges, including depreciation expenses of said operator's vessels based upon a twenty-year life expectancy, exceed 10 per centum per annum upon its net worth necessarily utilized in the operation of the subsidized vessels, services, routes, and lines, said operator shall pay over to the Commission 50 per centum of such net profits in excess of 10 per centum per annum: *Provided, however,* That such payments to the Commission shall never exceed the total amount of operating differential subsidiary theretofore paid to said operator *and the accumulated net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years:* * * *"

same ships. Their operation resulted in a small net loss for 1938, but in 1939 there was a profit in excess of ten per cent of the capital employed in their operation. Maritime's Assistant General Counsel prepared a memorandum for the Director of the Division of Finance in which he emphasized the fact that the basis of additional charter hire under § 709 is the *cumulative* voyage profits at the end of any calendar year. "This," he wrote, "is not the legal equivalent of prescribing that the profits to be taken into account are only those of the year then ending. The use of the word 'cumulative,' as well as other language in Section 709, is against this interpretation. \* \* \*."

Accordingly, Moore-McCormack was allowed to combine the results of its operations for the two years 1938 and 1939 and to settle its obligation for additional charter hire on the basis of the cumulative net voyage profits over the two-year period.

The same question again arose with respect to the operation of these same vessels in the period 1948–1951. Their operation resulted in net losses in 1948 and 1949, but substantial and excess profits in 1950 and the first half of 1951, ending with the expiration of that charter. Moore-McCormack settled its liability for additional hire on the basis of the cumulative results of its operations during the four-year period ending July 12, 1951, when that charter expired.

The same question arose in connection with the operations of another charterer which suffered a net loss in 1946 but realized excess profits in 1947. In the Commission's minutes of February 21, 1950, there is a second legal opinion, confirming the earlier opinion of its Assistant General Counsel, that the results of the two years should be combined for the purpose of computing additional charter hire.

By the Merchant Ship Sales Act of 1946,[14] Congress authorized the sale or chartering of surplus war-built merchant vessels. By § 5 [15] of that Act, the char-

ters of such vessels were made subject to the requirement of § 709 of the Merchant Marine Act of 1936. In 1950, Maritime adopted a formal regulation interpreting § 709 of the 1936 Act as incorporated by reference in the 1946 Act. That regulation permits a combining of a loss or a deficiency in net profit in one year with an excess profit in a succeeding year. The regulation does not authorize the carry forward of a profit from one year to a succeeding loss year, and the regulation refers to the proviso of § 709 in apparent explanation of the authorization to carry forward losses but not profits.

Maritime, thus, has consistently and formally interpreted the words "cumulative net voyage profits" as used in § 709 to require an accumulation of the results of the charter operations over the period of the charter. The limitation introduced by the 1950 Regulation under the 1946 Act that only losses could be carried forward, did not come from any restrictive interpretation of the word "cumulative"; it arose out of Maritime's construction, at that time, of the proviso at the end of § 709.

The proviso of § 709 contains no such limitation, however. Its obvious purpose was to assure that duplicating payments of additional charter hire should not be required on account of the same profit. Maritime's 1950 interpretation of the proviso, born of its concern over a carry forward of profits rather than a carry back of losses, seems capricious. At least, we cannot ascribe to the Congress a purpose to require additional charter hire of $50,000 of a charterer who has excess profits of $100,000 in one year and a loss of a like, or even a much larger, amount in the succeeding year, when no additional hire would be due if it lost $100,000 the first year and had excess profits in a like amount in the second year. The proviso is given effect and is reasonably construed if interpreted to prohibit only the use of the same reported profit in the calculation of additional charter hire in successive accountings.

14. 50 U.S.C.A.Appendix, § 1735 et seq.

15. 50 U.S.C.A.Appendix, § 1738(c).

The United States, through its Department of Justice, apparently recognizing the weakness of Maritime's restrictive interpretation of the proviso of § 709, disavows Maritime's consistent and formal interpretation of the word "cumulative." It contends that the statute does not permit a combining of losses and profits of different years, whether the loss year succeeds or precedes the profit year. The interpretation, however, is not the most natural reading of the statute; it is not supported by what is to be gleaned from the legislative history, and it conflicts with the consistent administrative construction.

The United States seeks to bolster its interpretation by reference to the fact that in § 606, and elsewhere, the Congress made quite plain and specific its intention that profits and losses were to be cumulative, while that intention is not so clearly evident in the language of § 709. In § 606, however, that intention is made plain because the statute, itself, had to provide the specific period over which the cumulation of profits and losses was to occur, while, under § 709, the period of cumulation is dependent upon the period of the charter. The exact language of § 606(5) could not be employed in § 709. There is also the countervailing consideration that the congressional purpose generally to permit and require cumulation of profits over periods of successive years applied to its provision for additional charter hire as well as to its provision for recapture of operating differential and construction subsidies. If other words than those employed in § 709 might have provided a clearer expression of the congressional intention, it does not follow that a construction of that section which harmonizes it with the general congressional purpose is not to be preferred to one that leaves it in disharmony with those obvious purposes.

Finally, the United States makes an irrelevant assertion that the provision for additional charter hire was not intended to guarantee a profit to the charterer. Of course, it was not. Moore-McCormack, over the life of this charter,

has suffered a cumulative loss of several millions of dollars. The question is not whether the United States is required to reimburse it for that loss, for there is nothing which suggests that it is. The only question is whether Moore-McCormack is required to pay an additional sum on account of additional charter hire, which, after subsidy adjustment, will increase its cumulative loss by approximately another $300,000. Moore-McCormack claims no right to a profit and no right to reimbursement for any loss sustained. It contends only that, having paid the basic charter hire of $22,000 per month per vessel, it should not be required to pay additional charter hire when it sustained over the period of the charter very substantial losses in its charter operations.

We conclude, therefore, that, properly construed, § 709 permits and requires the cumulation of profits and losses over the period of the charter as the basis of the calculation of additional charter hire, and that no additional charter hire is now due by Moore-McCormack by virtue of its charter operations under the 1951 charter.

■ The United States makes a further contention that Moore-McCormack is estopped to contest the claim for additional charter hire. This arises out of the fact that Moore-McCormack has filed annual reports required by Maritime and in the form prescribed by Maritime, without asserting its present contention. Estoppel could hardly arise, however, out of its compliance with Maritime's reporting and accounting requirements, and the point was entirely academic until the results of the charter operations in all of the years was known. Moore-McCormack did make its position known in 1957 before final approval of its accounting for any year within the charter period.

■ The United States also points to the fact that Moore-McCormack filed a legal memorandum with Maritime in 1941, in which it took an inconsistent position, and that it did not contest in the courts Maritime's failure to combine

a small loss in 1942 with an excess profit in 1941, realized by Moore-McCormack in the charter operation of the SS West-Keene. These, however, serve as a very insubstantial basis for a finding of an estoppel. If it once made an inconsistent contention in 1941, its position at all other times was quite consistent and was asserted with respect to the operations of these same ships under the earlier charters. Moreover, Maritime then accepted the consistent contentions as they there applied.

Certainly, acquiescence in Maritime's requirements of it ought not to foreclose the present contention that Maritime has improperly construed and applied the statute.[16]

The District Court considered the estoppel question. It did not decide it, for it was unnecessary to do so in light of its construction of § 709. However, it indicated great doubt as to whether an estoppel could arise and stated its opinion that it was very unlikely that Maritime would have terminated Moore-McCormack's operation of the "Good Neighbor Fleet" if Moore-McCormack had given earlier indication that it would raise the pending question in the event that, after termination of the charter, it appeared that it had suffered an overall loss. We agree with those observations of the District Court and find no basis for the imposition of an estoppel.

We conclude that since Moore-McCormack suffered an overall substantial loss in the charter operation during the period of the charter, there is no additional charter hire due under § 709. Since it also appears however that there has been an overpayment of subsidy, or that subsidy payments are subject to some recapture, because of our determination that no additional charter hire is due, the case will be remanded to the District Court for entry of such further orders and the conduct of such further proceedings as may be required in the light of this opinion.

Reversed and remanded.

16. Sword Line, Inc. v. United States, 2 Cir., 228 F.2d 344, aff'd 2 Cir., 230 F.2d 75, aff'd as to admiralty jurisdiction, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493; American Export Lines, Inc. v. United States, Ct.Cl., 290 F.2d 925; Dichman, Wright & Pugh, Inc. v. United States, S.D.N.Y., 144 F.Supp. 922; A. H. Bull Steamship Co. v. United States, 108 F. Supp. 95, 123 Ct.Cl. 520; Southeastern Oil Florida, Inc. v. United States, 119 F.Supp. 731, 127 Ct.Cl. 409, cert. den. 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658; Central Gulf Steamship Corporation v. United States, 172 F.Supp. 701, 145 Ct. Cl. 647.