**BLACK DIAMOND STEAMSHIP CORP.,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 9933.

United States Court of Appeals
Fourth Circuit.

Argued May 31, 1965.

Decided Sept. 8, 1965.

---

Robert N. Kharasch, Washington, D. C. (George F. Galland, Amy Scupi, Washington, D. C., and Robert H. Williams, Jr., Baltimore, Md., on brief), for appellant.

Walter H. Fleischer, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Dept. of Justice, and Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Circuit Judge, and HUTCHESON, District Judge.

ALBERT V. BRYAN, Circuit Judge:

The two-year limitation of the Suits in Admiralty Act, 46 U.S.C. 741, 745, was applied by the District Court in a summary judgment to bar recapture by Black Diamond Steamship Corporation of additional charter hire paid the United States under a contract for the demise of several cargo vessels from 1946 to 1949. The payments were made in 1946 and 1947 and the libel for the recovery was filed in November 1956. In the undisputed circumstances, we conclude the cause of action did not accrue earlier than August 1955 and the suit was timely.

The ships were chartered by the United States Maritime Commission [1] (a successor to the War Shipping Administration) by contract MCc 41815, pursuant to the provisions of the Merchant Ship Sales Act of 1946, 50 U.S.C. App. 1735 et seq. By § 5(c) of the Ship Sales Act, 50 U.S.C. App. 1738(c), the provisions of § 709(a) of the Merchant Marine Act, 1936, 46 U.S.C. 1101, 1199(a), were incorporated into the former, the adopted terms reading in part:

"(a) Every charter * * * shall provide that whenever, at the end of any calendar year * * * the cumulative net voyage profits * * * shall exceed 10 per centum per annum on the charterer's capital * * * the ·charterer shall pay * * * as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum * * * ."

Clause 13 of the Black Diamond charters after prescribing a sliding scale for such additional hire, on the basis of excess profits, provides for "preliminary" statements and payments to the owner as follows:

" * * * The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire * * * at such times and in such manner and amounts as may be required by the Owner; provided, however, that *such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner*, at which times such payments will be made to the Owner as such preliminary statements or *final audit* may show to be

---

[1]. Throughout this opinion our references to "Commission" will include its successors and transferees of authority, including the Maritime Administration. See 46 U.S.C.A. 1111, Historical Note.

due, or such overpayments refunded to the Charterer as may be required." (Accent added.)

■ The validity of the sliding scale of the additional hire was established in Massachusetts Trustees v. United States, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed. 2d 268 (1964). Moreover, in United States v. Moore-McCormack Lines, Inc., 308 F.2d 866 (4 Cir. 1962), cert. den. 372 U.S. 944, 83 S.Ct. 937, 9 L.Ed.2d 969, we declared the right of the charterer to cumulate and average the profits and losses incident to the chartered operations over the duration of the charter rather than on a yearly basis. Those decisions came down after the events of the present litigation, but they are retrospectively effectual here to establish the premises of Black Diamond's claim.

Black Diamond's claim is that during the charter period—September 1946 to August 1949—it was entitled to the benefits of averaging computations, and, therefore, to the return of such additional charter hire as had been paid, under the Commission's requirement, in excess of the amount due upon averaging the profits and losses over the charter term. The refund, the Government pleads, cannot be allowed because the claim was not seasonably asserted, in that it arose more than two years before the commencement of the suit in November 1956.

In our view the plea is refuted by the terms of the charter and the administrative actions of the Commission. These conclusively demonstrate that the "final audit" within the understanding of Clause 13 was not made before 1955. The interim accountings—from the inception of the charter until August 1955—are proved by their accompanying circumstances to have been provisional only.

The method of accounting required of charterers was first outlined by the Commission in General Order 60, as amended by Supplement 8, issued October 29, 1946. It demanded preliminary payments every month, but declared that they should be "subject to adjustment upon completion of audit by the Commission covering the period involved, and neither the tender thereof by the charterer, nor its acceptance by the Commission, shall prejudice the right of either under the applicable bareboat charter agreement or otherwise".

Supplement 21 to General Order 60, promulgated February 21, 1950, was the next directive. It ordered each charterer to submit "a separate final accounting of additional charter hire * * * for each annual or overall accounting period" under a charter such as Black Diamond's here. Included also was a requirement that the charterer remit to the Government any excess of accrued additional charter hire above the payments theretofore made on account, and, conversely, allowed the charterer to apply for the refund of any overpayment. The Supplement repeated the recognition that the preliminary payments and accompanying statements were wholly tentative.

In conference, Black Diamond advised the Commission it had prepared a final accounting as of June 30, 1950, but could not submit it within the requisite time since a large number of items were still outstanding and unsettled. On November 28, 1950 the Commission wrote Black Diamond acknowledging the difficulty. It suggested that this accounting be submitted with the reservation that it was subject to adjustment "as a result of (1) *subsequent decisions with respect to any items pending with the Maritime Administration* (2) subsequent adjustments in connection with unsettled claims and (3) *subsequent establishment of any liabilities which have not as yet arisen,* which would effect [sic] such accounting".

On December 13, 1950, in response to the Commission's letter of November 28, 1950, Black Diamond wrote the Commission referring to the conference and saying:

" * * * We also said [at conference] we did not feel that we could submit [our accountings] to the Administration without first obtaining assurance from the Administration regarding supplementary accountings. *Our reason for this is*

*that Supplement 21 to G.O. 60 provides that these accountings be labeled 'Final Accounting' although it must be evident that these accountings cannot be 'final'.* No provision is made \* \* \* for the submission and consideration of supplementary accountings that because of the very nature of the business will have to be made in order that any accountings \* \* \* can be considered 'final'. \* \* \*

"In the absence of instructions regarding the foregoing, we do not see our way clear to forwarding these so-called 'final accountings' to the Administration without first obtaining from the Administration, in writing, their assurance that supplementary accountings, such as referred to above, will be accepted and *that the Administration will reimburse us for any overpaid additional charter hire shown to be due to us by such supplementary accountings*." (Accent added.)

On January 26, 1951, the Commission answered this letter of Black Diamond, in pertinent part as follows:

"You [are] also advised that the certification required \* \* \* in Supplement 21 to General Order 60 may be modified to indicate that the accounting covered thereby is subject to subsequent adjustment.

\* \* \*

"The Administration realizes that certain adjustments may have to be made subsequent to the date of the final Accountings under Supplement 21 to General Order 60, which will require the Charterer to revise its statements and submit supplementary Accountings, therefore, your Accountings should be submitted with the reservations suggested in our letter of November 28, 1950 as soon as possible."

The Government itself desired to be assured that the remittances of additional charter hire be not considered as a final settlement. To this end the Com-

mission issued a memorandum, dated May 14, 1951, directed to all charterers, stating:

"Where a voucher check is tendered by the Charterer, it is requested that no reference be made thereon through restrictive legend or otherwise to the effect that it is a final settlement. The accompanying letter of transmittal should state that the remittance is *on account* of additional charter hire due the Maritime Administration and is subject to adjustment upon the completion of final accounting between the Charterer and the Maritime Administration and that neither the tender of such payment by the Charterer, nor its acceptance by the Maritime Administration shall be construed as an approval of the correctness of the amount thereof, nor as a waiver of the rights or remedies of either party under the terms of the agreements involved or otherwise. \* \* "

Apparently to avoid any misunderstanding whatsoever, Black Diamond wrote the Commission on June 15, 1951. The letter stated:

" \* \* \* we again refer you to our letter, dated December 13, 1950 \* \* \*. In response thereto \* \* \* [The Commission] did not give us the assurance we requested in the last paragraph of our letter, dated December 13, referred to above. [The request was for an assurance, as noted, supra, "that the [Commission] will reimburse us for any overpaid additional charter hire shown to be due to us by such supplementary accountings".]

"If, \* \* \* 'the Administration realizes that certain adjustments may have to be made subsequent to the date of the final accountings \* \* \* ' we see no reason why the Administration should not comply with the request contained in the last paragraph of our letter, dated December 13, 1950.

"Furthermore, under such circumstances, we feel that the Accountings

in question should not be labeled 'Final' nor should affidavit accompanying these Accountings state that they reflect a 'complete statement of the additional charter hire accrued to the U. S. Maritime Commission.' "

In August 1951 Black Diamond filed an accounting extending through June 30, 1951. Termed a "final accounting", it was audited by the Commission in February 1952 and report of the audit was sent to Black Diamond on September 22, 1952 with the Commission's approval. In its letter of transmittal the Commission said:

"The revised accountings are subject to further adjustment to take into account (a) *applicable items recorded subsequent to June 30, 1951,* * * * and (e) *any errors or omissions later developed.*

"If your payments on account of additional charter hire exceed the total amount accrued to the Administration as shown in the attached revised accountings, *you may submit a claim for refund* of the excess payments in the form of a Public Voucher as provided in Supplement 21, to General Order 60." (Accent added.)

From July 1, 1951 through March 1956 Black Diamond disbursed $199,535 in almost 150 transactions stemming from charter operations and paid under charter requirements. During the same period it received in the same connection $257,843.

With a letter dated August 9, 1955, Black Diamond submitted a "final accounting under the Contract [the charters] covering the period September 1, 1946 through August 31, 1949". Referring to the previous accounting "prepared in accordance with Supplement 21 of General Order 60" reflecting entries recorded through June 30, 1951, it specially directed the attention of the Commission to the critical premises of the accounting, viz.:

"The accounting submitted herewith differs from the one submitted on August 21, 1951 in three important respects:

(1) The computation of cumulative net voyage profit is based upon the *entire period of operations under the Contract,* in accordance with Section (5) (c) of the Ship Sales Act, 50 U.S.C. App. 1738(c) and Section 709 of the Merchant Marine Act, 1936, 46 U.S.C. 1199.

(2) Additional Charter hire is calculated on the basis of one-half of the cumulative net voyage profit in excess of 10 percent per annum of capital necesarily employed, in accordance with the statutory authority set forth above.

(3) This is submitted for 'final audit' within the meaning of Contract MCc 41815." (Accent added.)

This account was audited and a report thereof forwarded to Black Diamond on September 28, 1955.

Demand was made in Black Diamond's letter for overpayment of additional charter hire in the sum of $726,937.47. The sum now claimed—$247,315.67—is the amount of overpayment of additional charter hire when that obligation is figured alone on "the entire period of operations", that is the averaging of profits and losses over the span of the charters. Net profits or losses over the charter years had been as follows:

| | |
|---|---|
| 1946 | $ 215,218.81 |
| 1947 | 1,286,878.95 |
| 1948 (loss) | (788,582.64) |
| 1949 (loss) | (45,606.40) |
| Total Profits | $ 667,908.72 |

During the first two years preliminary payments to the Commission from Black Diamond for additional charter hire amounted to $943,050.41; during the last two years, with no net profits, no such instalments were paid.

The demand of Black Diamond in its letter of August 9, 1955 was refused on the ground that the bases of computation contained in paragraphs (1) and (2)—cumulative profits calculated on the period of operations and disregard of the sliding-scale reckoning—were impermissible. Since then, as we have observed, the entire-period accounting has been upheld, United States v. Moore-McCormack Lines, Inc., supra, 308 F.2d 866, and the sliding-scale charges have been sustained, Massachusetts Trustees v. United States, supra, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268.

■■ To summarize, our opinion—that the limitation period did not commence prior to November 1954, two years before the suit—rests on our interpretation of charter Clause 13 as postponing the onset of that period until "final audit" and on the factual premises just recounted showing that no final audit was attempted or practicable before 1955. The charter clause points to the conditional status of the periodic payments. Non-finality was recognized, too, by the fact that after the requirement of monthly remittances by General Order 60, Supplement 8, in October 1946, no other accounting instruction was forthcoming until February 21, 1950—in G.O. 60, Supplement 21—long after the expiration of all Black Diamond's charters. Thus, during the charter periods definitive directions were non-existent. Even the Supplement was amended afterwards on June 5, 1951. Moreover, as late as May 14, 1951, the Commission itself was insisting that the accounting then in progress was conditional, as witness its memorandum of that date advising that remittance checks should not carry a notation of a final settlement. Significantly, this fact was mentioned in United States v. Moore-McCormack Lines, Inc., 308 F.2d 866, 871 fn. 10, as pertinent to the limitation question.

True, in August 1951, Black Diamond filed a "final accounting". Obviously, however, it was not considered a final audit within the meaning of Clause 13 of the charters because on September 22, 1952 the Commission wrote the charterer that the accounting was subject to "any errors or omissions later developed" and adverted to the right of Black Diamond to submit a claim for refund of excess payments. Neither this reference, nor the letters that passed in 1950–51 between Black Diamond and the Commission can justifiably be read, as the Government would have us, to restrict the subsequent adjustments to subsequent debits and credits. But even if they do, they conclusively imply that the account was not ripe to be squared off. The abeyance from 1951 until, certainly, 1955 in the footing up of a substantially final tally is also evidenced by the not inconsiderable entries of expenditures of $199,535, and receipts of $257,843, by Black Diamond in the interval from the last accounting of June 30, 1951 until March 1956. The occurrence of items after August 9, 1955 can show that the final accounting had not then been reached, but surely it does not prove an earlier totting up of accounts.

At no stage did the Commission intimate that the account was closed. Indeed, indications were quite to the contrary. This attitude was altogether correct, for it was in conformity with Clause 13 assuring the charterer of his right to have "overpayments refunded".

■ With the account still open we see no reason why Black Diamond could not defer until "final audit" assertion of the cumulative averaging method of arriving at the correct total of the overpayments. The argument does not question the legality of the additional hire but only its application. Consequently the claim did not necessarily arise when the payments were made. American-Foreign Steamship Corp. v. United States, 291 F.2d 598, 603, 607 (2 Cir. 1961). There was no obligation to urge it sooner. Any attempt to do so would probably have encountered a plea of prematureness—that it was something to be taken care of on final audit.

■ The overpayments were made by Black Diamond because so directed by the Government. Unlike tax assess-

ments, they were required pursuant to contract, and no statute governed the recovery procedure. Yet the Government now says that because Black Diamond complied without protesting on each occasion, the aggregated payments or possibly each separate payment, with accompanying accounting, must be taken as a final casting up of accounts and a final audit. We cannot agree; we implied as much in United States v. Moore-McCormack Lines, Inc., 308 F.2d 866 (4 Cir. 1962), with Judge Haynsworth saying for the court, pp. 874 and 875:

> "The United States makes a further contention that Moore-McCormack is estopped to contest the claim for additional charter hire. This arises out of the fact that Moore-McCormack has filed annual reports required by Maritime and in the form prescribed by Maritime, without asserting its present contention. Estoppel could hardly arise, however, out of its compliance with Maritime's reporting and accounting requirements, and the point was entirely academic until the results of the charter operations in all of the years was known. Moore-McCormack did make its position known in 1957 before final approval of its accounting for any year within the charter period.
>
>     *    *    *    *    *    *
>
> "Certainly, acquiescence in Maritime's requirements of it ought not to foreclose the present contention that Maritime has improperly construed and applied the statute."

In truth, United States v. Moore-McCormack Lines, Inc. unsparingly requires definition of "final audit" as we now determine it. That case dealt with a charter phrased almost identically with Clause 13, a charter drawn, as is Black Diamond's, in accord with § 709(a) of the Merchant Marine Act of 1936, supra. The opinion noted, at p. 869:

> "Final determination of all items entering into a calculation of net voyage profits must await the settle-

ment and adjustment of many matters. While preliminary accountings were submitted in accordance with Clause 6(b) [corresponding with Clause 13] * * * final accounting for 1951 was not settled and approved * * * until November 7, 1958. The accounting for 1952 was approved on December 19, 1958 and the Company's final accounting for 1953 was not submitted to Maritime until February 17, 1959."

Thus, the account was open for seven years and recapture allowed notwithstanding. Instantly, the account is held current for nine years.

While United States v. Moore-McCormack Lines, Inc. did not decide an issue of limitations, it did decide that "final audit" could not come until after the rendition and payment of all preliminary statements. More importantly it recognized, at 871, fn. 10:

> "The final audit to which Clause 6(b) [Clause 13 presently] of the charter refers, may well be one final audit of all operations under the charter made after its expiration. * * *"

■ The Government argues that the word "each" preceding the phrase "final audit" in Clause 13 discloses an intent to consider every periodic settlement a final audit. This view is not consonant with the reading of it in United States v. Moore-McCormack Lines, Inc., supra. We think there can be but one final audit. More than one was noticed in Clause 13 because it covered two types of charters with a final audit for each. The first was the earlier War Shipping Administration charter, known as Warshipdemiseout, and the other, the instant form issued by the Maritime Commission, designated Shipsalesdemise. See American-Foreign Steamship Corp. v. United States, 291 F.2d 598 (2 Cir. 1961) dissenting opinion, p. 615, fn. 1.

Although cited in opposition to the view we take, the ultimate decision of American-Foreign Steamship Corp. v. United States, supra, 291 F.2d 598 is ac-

tually not contra. The distinguishing holding there was that liability for additional hire was to be ascertained on a yearly rather than on a charter-term basis. The opinion was handed down before our differing conclusion in United States v. Moore-McCormack Lines, supra, 308 F.2d 866. Moreover, it was directed, first, to the statutory limitation as applied to claims founded upon the illegality of the Commission's hire rates. That proposition is not now before us, legality having been accorded the Commission's rates in Massachusetts Trustees v. United States, supra, 377 U.S. 235, 84 S.Ct. 1236.

As to the claims based upon the computation of the hire, American-Foreign Steamship Corp., 291 F.2d at pp. 607, 608, conceded that "final settlement of the bareboat charter accounts had to be postponed far into the future" and to "put off for later determination the validity of the opposing views on the correct interpretations of the charters at least until either the charterer in preliminary statement, or owner in final audit set forth its claims". It predicated its finding, of the occurrence of the "final audit", on a yearly and not a charter-duration reckoning, and hence it measured the limitation from an event we have since held not governing. Consequently, the Second Circuit determination upon the limitation defense is not persuasive here.

The opinion in American Eastern. Corporation v. United States, 133 F.Supp. 11 (D.C.S.D.N.Y.1955) aff'd. per curiam 231 F.2d 664 (2 Cir. 1956), cert. den. 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497 does not traverse our view. Despite its forthright discussion, we think a two-way trade was in truth involved there. Besides, more than "a one-way account" exists here. Moreover, in that case two years had clearly run after what appears to have been a final audit.

Our conclusion does not allow agreement or understanding to enlarge the two-year limitation of the Suits in Admiralty Act. It is merely a determina-tion of when that limitation begins to run.

Throughout consideration of the issue here, it must be remembered that Black Diamond is asking only for what is its own, and not to create a liability upon the Government. The latter, on the present record, has been unjustly enriched. The delay, even if inordinate, has not injured the United States for it has been possessed of the money ever since the funds were claimed to be due.

As we think Black Diamond is not time-barred, we will return the case to the District Court for trial on the merits of its claim.

Reversed and remanded.