AMERICAN MAIL LINE, LTD., a corporation, Libelant,

v.

UNITED STATES of America, Respondent.

JAMES GRIFFITHS & SONS, INC., Libelant,

v.

UNITED STATES of America, Respondent.

OLYMPIC STEAMSHIP CO., Inc., Libelant,

v.

UNITED STATES of America, Respondent.

Nos. 16231, 16218, 16233.

United States District Court
W. D. Washington, N. D.
Dec. 19, 1962.

Ben C. Grosscup, of Grosscup, Ambler, Miller & Lawrence, Seattle, Wash., J. Franklin Fort, of Kominers & Fort, Washington, D. C., for libelant American Mail Line, Ltd.

Brockman Adams, U. S. Atty., Douglas M. Fryer, Asst. U. S. Atty., Seattle, Wash., Lawrence F. Ledebur, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for respondent United States.

Douglas S. Palmer, of Wright, Innis, Simon & Todd, Seattle, Wash., for libelant James Griffiths & Sons, Inc.

Harry Henke, Jr., of Skeel, McKelvy, Henke, Evenson & Uhlmann, Seattle, Wash., for libelant Olympic Steamship Co., Inc.

BEEKS, District Judge.

The captioned cases, arising out of the aftermath of World War II, have been consolidated for purposes of trial as to their common issues. There are issues involved in Griffiths and in Olympic which are not common to all and such issues have been reserved for determination at a future date. The libels in each case, brought under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., sound in quasi contract and seek the return of so-called additional charter hire alleged to have been illegally exacted from libelants (charterers) in violation of Section 709(a), Merchant Marine Act of 1936, 46 U.S.C. § 1199, incorporated by reference in Section 5(c) of the Merchant Ship Sales Act of 1946, 50 U.S.C. Appendix § 1738(c), (herein called Section 709(a)), which insofar as is pertinent reads:

"(a) Every charter made by the Secretary of Commerce * * * shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall

exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Secretary, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum

\* \* \*."

The Government denies the illegality and has cross-libeled for charter hire allegedly due and unpaid in accordance with the terms of the charters involved or failing that, on the theory of unjust enrichment. The Government vigorously contends by way of defense that all libels are time-barred and each party asserts the defense of estoppel and/or voluntary payment in response to the affirmative claims set forth in the libels and cross-libels. Cross motions for summary judgment in American Mail have heretofore been heard and denied and all cases are now before the Court for decision on the merits as to the common issues. The amount due on the respective theories of each party is not in dispute, the only question before the Court being whether there is liability on the part of the Government or upon the charterers.

Following the cessation of hostilities in World War II, the Government had a virtual monopoly on the ownership of ocean-going tonnage and these cases, as well as many others filed elsewhere, arose from the Government's attempt to rehabilitate the American merchant marine and return it to private operation in accordance with announced Congressional policy.[1]

In March 1946, pursuant to such policy, the Government determined to sell or charter its surplus war-built or acquired vessels to private operators.[2] In carrying out this policy, the War Shipping Administration entered into temporary "interim" demise charters, designated "WARSHIPDEMISEOUT—203" (herein called Form 203), with established steamship companies under the provisions of Public Law 101 (77th Cong., 1st Sess.; Act of June 6, 1941; 55 Stat. 243, 50 U.S.C.Appendix § 1273(a)), pending the fixing of prices for the vessels and the issuance of regulations and charter forms under the 1946 Act.[3]

Libelants entered into such interim bareboat charters which were modeled upon the provisions of the 1946 Act, and provided for "basic charter hire" of 15 percent of the proposed sales price, and for "additional charter hire" payable in accordance with the aforesaid provisions of Section 709(a), Merchant Marine Act, 1936.

On September 1, 1946, Maritime[4] supplanted the interim charters with the Ship Sales Act form of charter designated "SHIPSALESDEMISE—303" (herein called Form 303) and it is this form of charter which is involved herein. All libelants executed such a charter: On October 26, 1946, American Mail Line executed "as of" September 2, 1946, and it thereafter operated 13 vessels under the charter during the years 1946 through 1949; on October 7, 1946, Olympic Steamship Company executed "as of" September 2, 1946, and it thereafter operated 10 vessels under the charter during substantially the same period of time; on October 28, 1946, James Griffiths executed "as of" October 5, 1946, and it thereafter operated 2 vessels under the charter until October 15, 1948.

Form 303, like Form 203, fixed basic charter hire at 15 percent of the statutory sales price pursuant to Section 5(b) of the 1946 Act, 50 U.S.C.Appendix § 1738(b) (herein called Section 5(b)). However, when fixing the rate of "additional charter hire," Maritime substituted for the 50 percent sharing of excess profits specified in Section 709(a) and

---

1. Sec. 2, Merchant Ship Sales Act of 1946; 50 U.S.C.Appendix § 1735.

2. 50 U.S.C.Appendix § 1740(b).

3. 50 U.S.C.Appendix § 1735, et seq.

4. Maritime, as used herein, includes United States Maritime Commission and its successor Federal Maritime Board/Federal Maritime Administration.

in Form 203, a sliding scale of rates ranging from 50 to 90 percent of such profits.

Before executing Form 303, libelants, through associations of which they were members, protested the proposed inclusion of the sliding scale rates on the ground that they violated the 50 percent rate fixed by Section 709(a).

Following receipt of the protests, Maritime in drafting Clause 13 of Form 303, relating to additional charter hire, sub-

stantially amended and revised the clause of Form 203 bearing the same number and relating to the same subject and it is Clause 13 of Form 303 which forms the basis of this litigation.

As suggested by Judge Friendly in his dissenting opinion in American-Foreign Steamship Corp. v. United States, 291 F.2d 598, 613 (2nd Cir.), the differences in the two clauses can best be understood by setting down in parallel columns the relevant provisions of each:

"Form 203.

"Clause 13. *Additional Charter Hire.* After redelivery of all Vessels under this Agreement, if the cumulative net voyage profits computed for the period of the agreement (after the payment of the basic charter hire provided herein and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall be in excess of a rate of ten (10) per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels during the period of the agreement (all as hereinafter defined in Clause 23) the Charterer shall pay to the owner at Washington, D. C. within sixty (60) days thereafter, an amount equal to one-half of such cumulative net voyage profit in excess of an amount computed for the period of the agreement at the rate of ten (10) per centum per annum on such capital as hire in addition to the hire payable under Clause 12; *Provided, however,* That such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment upon the completion of final audit by the Owner, at which time such payments will be made by or to the Owner as such final audit may show to be due."

"Form 303. "

"Clause 13. *Additional charter hire.* If at the end of the calendar year 1946, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined, the Charterer shall pay over to the Owner at Washington, D. C., within 30 days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to the percentages of such cumulative net voyage profit in excess of 10 per centum per annum on such capital computed in accordance with the following table (but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period):

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) not in excess of $100. per day, 50%.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $100. per day but not in excess of

$300. per day, 75% on such excess over $100. per day.

"Cumulative net voyage profit (in excess of 10% per annum on capital necessarily employed) in excess of $300. per day, 90% on such excess over $300. per day.

"The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire and on account of any additional charter hire accrued under any War Shipping Administration Form 203 (Warshipdemiseout) charter (prior to the times of payment provided for above or in such Warshipdemiseout charters) at such times and in such manner and amounts as may be required by the Owner: *Provided*, however, That such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."

---

In the American-Foreign case, the Government conceded in its briefs that the revision of Clause 13 was prompted by the protests, but here the Government adopts a contrary position, contending that the protests had no part in the redrafting of Clause 13, and that it was not the intention of the parties to postpone the accrual of claims based on illegality until a future time. Such being the issue, this Court must make a finding as to what the parties intended when Clause 13 was changed.

It appears from the evidence that the following transactions occurred in connection with the drafting and adoption of Form 303:

August 9, 1946—Maritime approved the sliding scale rate of additional charter hire and directed its General Counsel to submit a form of charter for approval.

August 12, 1946—Maritime advised libelants by telegram of the basic Form 303 requirements, including the sliding scale rate of additional charter hire.

August 15, 1946—Libelants, through industry representatives, by telegram to Maritime protested the legality of the sliding scale rate of additional charter hire.

August 21, 1946—The General Counsel of Maritime submitted a form of charter to Maritime and recommended that it be adopted. The form submitted was identi-

cal to the form adopted and executed by the parties except that Clause 13 did not contain the final paragraph commencing with the words "The charterer agrees to make preliminary payments to the Owner * * *."

September 4, 1946—The General Counsel of Maritime submitted to Maritime a proposed amendment to Clause 13 which was adopted by Maritime on the same date. The proposed amendment is identical to the existing final paragraph of Clause 13.

██ ██ The wording of the proviso of Clause 13 as it appeared in Form 203 would have been adequate to protect the interests of the Government. Why, then, was that wording amended if it was not intended to give effect to the protests of the charterers? The Government has offered no satisfactory explanation as to the reasons for the substantial and significant changes. From a review of all of the evidence, I am convinced that the revision resulted from charterers' protests and was intended to postpone the accrual of all claims, including those based on illegality. Regulations issued by Maritime with respect to "Preliminary determination of 'additional charter hire' ",[5] instructions issued by Maritime covering restrictive legends on voucher checks issued by charterers,[6] numerous letters from Maritime to libelants and other charterers to the effect that charterers' claims based upon illegality were anticipated at the time of entering into the charters and that such rights are reserved in the charters,[7] and the positive representations made by Government counsel in other litigation overwhelmingly support this conclusion. Furthermore, Maritime prepared the charter, including Clause 13, and it should be construed against the Government. Northern Pacific Ry. Co. v. Twohy Bros. Co., 95 F.2d 220 (9th Cir.).

Although the proviso to Clause 13 provides that preliminary payments of additional charter hire shall be subject to adjustment at alternative periods, the Government concedes that insofar as these cases are concerned the adjustment of claims covered by Clause 13 shall be made upon the completion of final audit by Maritime. The question then arises as to whether there has been a final audit within the meaning of Clause 13, and if so, whether these actions have been instituted within two years therefrom. Once again, the Government takes a position inconsistent with that taken in the American-Foreign case wherein the Government apparently conceded that all actions were begun within two years of final audit.[8] In these cases, however,

---

5. "Such payments shall be deemed to be preliminary and subject to adjustment upon the completion of audit by the Administration covering the period involved, and neither the tender thereof by the charterer, nor its acceptance by the Administration, shall prejudice the rights of either under the applicable bareboat charter agreement or otherwise." (46 CFR 299.31(k) (1) at p. 526)

"(5) That if, in any instance, the rules and regulations prescribed herein should conflict with the provisions of an applicable statute or agreement, such provisions shall govern." (46 CFR 299.56 (h) (5) at p. 548)

6. "Where a voucher check is tendered by the Charterer, it is requested that no reference be made thereon through restrictive legend or otherwise to the effect that it is a final settlement. The accompanying letter of transmittal should state that

the remittance is on account of additional charter hire due the Maritime Administration and is subject to adjustment upon the completion of final accounting between the Charterer and the Maritime Administration and that neither the tender of such payment by the Charterer, nor its acceptance by the Maritime Administration shall be construed as an approval of the correctness of the amount thereof, nor as a waiver of the rights or remedies of either party under the terms of the agreements involved or otherwise." (May 14, 1951 letter from Maritime.) (Note 4, American-Foreign Steamship Corp. v. United States, 2 Cir., 265 F.2d 136, 141)

7. See Note 3, dissenting opinion of Judge Friendly, American-Foreign Steamship Corp. v. United States, 291 F.2d 598, 613.

8. Opinion of Judge Smith in American-Foreign Steamship Corp. v. United States,

the Government makes no such concession and this Court must decide the issue.

There is no definition of "final audit" in the charters or in Maritime's regulations or instructions. In Clause 28 of the charters, libelants agreed to submit accountings in the forms prescribed by Maritime according to its regulations, but Maritime did not publish its regulations with respect to such accountings until March 30, 1950. After the publication of the regulations, Maritime made retroactive changes thereto as late as June 8, 1951. The very nature of the operations required numerous adjustments which took the form of supplemental accountings. Such was recognized by Maritime's rules and by the course of dealings between the parties. The Government has conceded that all supplemental accountings rendered by charterers were properly submitted and in good faith. The accountings of charterers were sometimes called "final accountings" but there is not a single communication in any of the cases stating that a "final audit" has been completed. The purport of each audit letter of Maritime is that the charterers' current accountings had been reviewed but that they were subject to later adjustment and the letters deliberately and expressly reject finality of such reviews or audits.

■ It would serve no useful purpose to review all of the accounting transactions between the parties. Suffice it to say, that this Court is of the view that "each final audit" as used in the proviso of Clause 13 means one final audit for the Form 203 charters and one final audit for the Form 303 charters. Such an interpretation, though not precisely stated, seems to have been contemplated by the regulations and by the course of dealings between the parties who did not regard annual audits as final audits but merely as preliminary accountings. Such a construction is the only reasonable interpretation deducible from the practice of the parties. Accordingly,

I am of the opinion that there was not a final audit by Maritime at any time prior to the institution of these actions and that each action was commenced within a period of two years prior to final audit.

At this point, the cases under discussion are in substantially the same posture as American-Foreign Steamship Corp. v. United States, supra, and all that remains to be discussed on the time-bar issue is the legal effect of the findings the Court has heretofore made.

■ The Suits in Admiralty Act is libelants' exclusive remedy for relief. Aliotti v. United States, 221 F.2d 598 (9th Cir.); Johnson v. United States Shipping Board Emergency Fleet Corp., 280 U.S. 320, 50 S.Ct. 118, 74 L.Ed. 451. The limitations section thereof, 46 U.S.C. § 745, bars suits not brought within two years after the cause of action arises and this has been held to be a jurisdictional limitation. Osbourne v. United States, 164 F.2d 767 (2nd Cir.); Desmond v. United States, 217 F.2d 948 (2nd Cir.), cert. denied, 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246.

While there are undoubtedly many cases of like nature pending in district courts of the United States throughout the Nation, insofar as this Court can determine, the identical question of time-bar involved in the instant cases has been before only one appellate court— the Court of Appeals for the Second Circuit in Sword Line, Inc. v. United States, 228 F.2d 344, and the unusual series of cases culminating in American-Foreign Steamship Corp. v. United States, supra. This case held, in a three to two decision, that a number of claims identical to those at bar were time-barred. The history of the litigation in the Second Circuit is set forth in said opinion as follows:

> "The appellants are in all cases shipping concerns whose actions against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., have been dismissed in the Dis-

291 F.2d 598, 603, wherein it is said: "* * * it is undisputed that all ac-

tions were begun within two years of 'final audit.'"

trict Court for the Southern District of New York as time-barred. On appeal to this court, a panel composed of Circuit Judges Hincks and Medina and Retired District Judge Leibell affirmed the dismissal of the libels, American-Foreign Steamship Corp. et al. v. United States, 2 Cir., 1957, 265 F.2d 136, on the authority of Sword Line, Inc. v. United States, 2 Cir., 1955, 228 F.2d 344, affirmed on rehearing, 2 Cir., 230 F.2d 75, affirmed as to admiralty jurisdiction, 1956, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493, and American Eastern Corp. v. United States, D.C.S.D. N.Y.1955, 133 F.Supp. 11, affirmed 2 Cir., 231 F.2d 664, certiorari denied 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497.

"That panel, however, indicated that, were it not for the aforementioned two recent decisions by other panels of this court, it might well pass differently on the limitations question. Petition for reargument *in banc* was granted and the case was heard again by the then active Circuit Judges, Chief Judge Clark, and Judges Medina, Hincks, Moore and Waterman. A majority of that court rejected the Sword Line and American Eastern cases and held that the libels had been improperly dismissed. The causes were ordered remanded for further factual inquiry to determine whether the parties had agreed, in Clause 13 of the bareboat charters, to postpone suits on *all* questions until after final audit of the charters—thus suspending operation of the time-bar. Judges Waterman and Clark dissented, being of the opinion that Clause 13 clearly did not postpone the running of the limitations period and that Sword Line and American Eastern were correctly decided; Judge Clark, in his dissent, further questioned, under the wording of 28 U.S.C. § 46(c), the right of Judge Medina (who had retired from regular active service under the provi-

sions of 28 U.S.C. § 371(b) between the time of the submission of the appeals to the court *in banc* and the date of the decision in the case) to cast a vote on the *in banc* court.

"After the denial of a petition for rehearing, the Supreme Court granted certiorari only on the question of Judge Medina's interim retirement, 1959, 361 U.S. 861, 80 S.Ct. 117, 4 L.Ed.2d 101. That Court held, per Justice Stewart, that he had not been eligible; it vacated the *in banc* decision and remanded to this court for further proceedings, intimating 'no view as to the merits of the underlying litigation.' 1960, 363 U.S. 685, 80 S.Ct. 1336, 1340, 4 L.Ed.2d 1491."

Three opinions were written by the last *in banc* court (291 F.2d 598), the prevailing opinion of Judge Smith, a concurring and dissenting opinion by Judges Clark and Waterman, and a dissent and concurring opinion by Judges Friendly and Moore. Judge Smith held that Clause 13 did not and could not lawfully apply to the sliding scale dispute (the issue involved in the cases at bar) but that it could and did apply to other additional charter hire claims (not here involved). Judges Clark and Waterman believed that Clause 13 could not apply to any disputes. Thus, there was a majority with respect to the identical issue involved in the instant cases. Judges Friendly and Moore believed that Clause 13 controlled with respect to all "additional charter hire" claims and voted for the reversal of the time-bar dismissals with respect to all. Consequently, if this Court follows the majority, it must sustain the Government's contention that the libels here are time-barred. On the other hand, if it follows the dissent of Judges Friendly and Moore, it must overrule the Government's contention. Of the total number of Judges of the Second Circuit who considered the time-bar issue, a majority have felt that Clause 13 is controlling and that the time-bar dismissal should have been reversed. These are Judges Hand, Hincks, Medina, Moore

and Friendly. Only two Judges, Judges Clark and Waterman, were of the view that all dismissals should be affirmed and Judge Smith alone believed that some dismissals should be affirmed and some reversed.

■ The Government urges this Court to follows the majority in the last case. Doubtless, a district court should, wherever possible, follow a decision of the court of appeals of a sister circuit. Frankly, and with all due respect to the distinguished and learned judges involved, this Court is unable to do so. I cannot subscribe to the conclusions of Judge Smith, nor to those of Judges Clark and Waterman, who concurred with him, nor with the reasoning in support of the conclusions which they reached.

This Court prefers and adopts the reasoning in the dictum of Judge Hand (who concurred in a dismissal based upon a bankruptcy composition) in Sword Line v. United States, 228 F.2d 344 (2nd Cir.); the reasoning of Judge Hincks for the majority (Judges Medina and Moore concurring) on rehearing in American-Foreign Steamship Corp. v. United States, 265 F.2d 136, 144 (2nd Cir.), (invalidated by the Supreme Court because of the participation of Judge Medina following retirement); and in particular, the reasoning and conclusions reached by Judge Friendly in his dissenting opinion in the last of the American-Foreign cases, 291 F.2d 598, 613 (2nd Cir.). I would, however, add a few additional thoughts of my own.

The decision of the majority seems influenced by an over-protective attitude towards the Government with a desire to blame the charterers and to penalize them for the long delay in finalization, all of which has produced a paralogical result.

■ The majority opinion is premised, in part, upon the proposition that declaratory relief was available to charterers when they executed the charters and that the two year period of limitation began to run from that date. Long-view Tugboat Co. v. Jameson, 218 F.2d 547 (9th Cir.), is cited for the proposition that declaratory relief is available in admiralty but I do not construe that case to so hold. There has been serious doubt as to the availability of such a procedure in admiralty, McLain v. Lance, 146 F.2d 341, 343 (5th Cir.); States Marine Lines, Inc. v. United States, 196 F.Supp. 562 (N.D.Calif.), and this doubt led to the adoption of Admiralty Rule 59 in 1961. Assuming arguendo, however, that such a remedy was at all times available to charterers, it must be borne in mind that the Declaratory Judgment Act was enacted to *permit* parties to resolve their disputes before a cause of action has accrued, Maryland Casualty Co. v. Hubbard, 22 F.Supp. 697 (S.D. Calif.), 26 C.J.S. Declaratory Judgments § 28, p. 102, but not to *require* them to do so. Brennan v. Hawley Products Co., 182 F.2d 945, 949 (7th Cir.).

An agreement to extend or toll the period of limitation would probably have been futile and a provision such as that contained in Clause 13 negotiated after a cause of action had come into being would likewise probably be ineffective. The agreement here was for a different purpose. Neither at the time the form of the charter was prepared, nor at the time it was executed, nor at the time of any preliminary payment (except possibly in the last year of operation) could it be definitely known that there would be a profit subject to the contested provisions of Clause 13. Clause 13 permits and requires the cumulation of profits and losses over the period of the charter as the basis of the calculation of additional charter hire. United States v. Moore-McCormack Lines, Inc., 308 F.2d 866 (4th Cir.). A profit in the first year of operation could disappear in the second. Even at the time of the last preliminary payment the parties could not know the exact amount due. Couched in terms of preliminary payments and requiring many offsets and credits, the very nature of the contract required that disputes be reserved until after final audit—only at that time could ei-

ther party assert a claim against the other with any degree of finality. As said in Moore-McCormack, supra:

"Final determination of all items entering into a calculation of net voyage profits must await the settlement and adjustment of many matters.

\* \* \* \* \* \*

"\* \* \* what, if any, additional charter hire ultimately will be found to be due, cannot be determined until after expiration of the charter."

How, then, can it be said that a cause of action came into being at the time of the execution of the charters or at the time of the first preliminary payment.

Without condoning the extensive delay, this Court believes that the agreement to postpone disputes until after final audit was a wise exercise by Maritime of its authority and should be encouraged. The avoidance of multiplicity of litigation is both socially and economically desirable. The rule contended for by the majority would have required the filing of innumerable suits and resulted in a deluge of litigation—a result which should be avoided in the public interest and which, as Judge Friendly suggests, the parties may very well have sought to avoid.

The majority express unusual concern about the high interest rates that the Government would have to pay over the long period of years until final audit. As was said in the opinion of Judge Smith (291 F.2d at p. 605):

"\* \* \* The practical effect of construing Clause 13 in that manner would be to sanction the 'depositing' of huge 'overpayments' with the government, which deposits might be accruing an absolutely safe return of interest dependent on the outcome of law suits not even instituted until almost a decade later."

and in the concurring opinion of Judges Clark and Waterman, the postponement—

"would have the government holding the bag at high interest rates for many years or until the claimants were completely satisfied." (P. 610)'

The fact is that if charterers prevail here, they will be the losers in that they have been deprived of the use of substantial sums of money over a period of nearly 10 years without any interest. Section 5 of the Suits in Admiralty Act, 46 U.S.C. § 745, prohibits the allowance of interest until such time as suit is actually instituted, and Section 3 of the Act, 46 U.S.C. § 743, limits the rate of interest allowable against the Government to 4 percent. Furthermore, a court of admiralty may in the exercise of its discretion disallow interest after the institution of suit where libelant has not been diligent in bringing the case to trial. Coyle Lines, Inc. v. United States, 198 F.2d 887 (5th Cir.).

While libelants could have been more diligent in bringing these cases to trial after they were commenced, a study of the entire record convinces me that the long delay prior to suit was primarily the fault of Maritime in that it did not publish its accounting regulations until March 30, 1950 (three and one-half years after the effective date of the charters) ; it made changes in the regulations over an additional period of fourteen months (the last change being made on June 8, 1951) ; it failed to resolve accounting differences with charterers and it failed to audit accounts promptly. For example, American Mail submitted an accounting on August 25, 1950, which Maritime approved (with reservations) May 27, 1952—one year and nine months later. On October 31, 1952, American Mail protested Maritime's adjustment in the accounting affecting the liquidation compensation and other items. Thereafter, extended negotiations and correspondence followed with respect to the proper adjustment of the accountings. Finally, by exchange of correspondence under dates of April 11, April 26 and May 16, 1956, the accounting problems were settled by an agreement which (with other required adjustments) re-

sulted in a reduction of charter hire. In the letter of April 11, 1956, it was agreed that the adjustments would be made upon complete revision of the accountings to effect the proposed treatment of the liquidation fees. The accountings contemplated by the letter agreement of April 11, 1956, were submitted to Maritime on December 13, 1956, but were not audited by Maritime until August 22, 1962. Griffiths submitted an accounting to Maritime on September 9, 1952, and Maritime did not notify Griffiths this accounting had been approved until July 9, 1954 (Griffiths' libel was filed within two years thereafter). Olympic submitted a revised accounting to Maritime on August 19, 1952. Maritime approved April 15, 1954, allowing a refund, but held the account open for specified further adjustments. On August 25, 1954, Olympic submitted a further supplemental accounting. Maritime approved on April 22, 1955, allowing a substantial refund to Olympic (Olympic's libel was filed within two years of this audit).[9]

The majority conclude that Congress announced a policy that contract claims cognizable in admiralty are to be treated differently from the standpoint of stale claims than non-admiralty contract claims. Viewing the legislative history and objectives of the Suits in Admiralty Act, as well as the extensive litigation following its enactment culminating in a judicial determination that the Act provided the exclusive remedy against the United States, it would appear doubtful that Congress had any such policy in mind. Furthermore, it was not until Archawski v. Hanioti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (decided April 9, 1956), that it was finally determined an action of the character here involved was within admiralty jurisdiction.[10]

The majority state that the charterers had a path clearly open to them which would have protected their rights, in that they could have refused to pay charter hire in excess of 50 percent and forced the United States to sue them for the difference. Such is probably academically true, but it seems fatuous where a governmental agency is involved. It would be more realistic to say that charterers could have refused to pay charter hire in excess of 50 percent and thereafter had their charters terminated pursuant to Clause 14 thereof; in other words, to have gone out of business.[11] No doubt such a result would have followed their refusal to pay hire in excess of 50 percent.[12]

Having determined that the actions are timely brought, it is now necessary to proceed to the merits of the controversy. Charterers contend that the exaction of additional charter hire in excess of 50 percent of profits is illegal and in support of their contention take the position that Section 709(a) is a limitation. The Government contends to the contrary and in support of its contention takes the position that Section 5(b) authorizes the sliding scale rate in excess of 50 percent of profits.

9. In United States v. Moore-McCormack Lines, Inc., supra, involving the years 1951–1957, inclusive, Maritime did not approve the accounting for 1951 and 1952 until November and December, 1958.

10. See Sword Line, Inc. v. United States, 351 U.S. 976 (June 11, 1956), 76 S.Ct. 1047, 100 L.Ed. 1493, where admiralty jurisdiction was upheld in an identical cause of action on the authority of Archawski v. Hanioti, supra.

11. On Aug 12, 1946, Maritime sent a telegram to Form 203 charterers outlining terms of Form 303 Charter, including sliding scale of "additional charter hire."

The telegram gave the required 15 days notice of termination of all Form 203 Charters and informed charterers to accept the quoted terms of the Form 303 Charter or return the vessels.

12. The practical effect of such a refusal where the contract gave effect to an unlawful regulation was recognized in Shay v. Agricultural Stabilization & Conservation State Committee for Ariz., 299 F.2d 516, 522 (9th Cir.), as follows: " * * * the plaintiffs' only real alternatives were to sign it as printed or stay out of the program * * *."

From an examination of the statutes involved, two things are manifest: (1) Section 5(b) fixes the minimum rate as the prevailing world market rate (if below 15 percent per annum of the statutory sales price) and the maximum rate at any rate consistent with the policies of the Act, and (2) the provisions of Section 709(a) are required in the charter.

■ Hence, the resolvement of the illegality issue hinges upon whether Maritime had authority to provide for the payment of rates in excess of 50 percent of profits as basic charter hire pursuant to Section 5(b), and if this be answered in the affirmative, whether it did so.

As said in Dichman, Wright & Pugh, Inc. v. United States, 144 F.Supp. 922, 926 (S.D.N.Y.):

"I see no reason why the Commission should not fix charter hire 'at such rate as the Commission determines to be consistent with the policies of this Act' by inserting in the charter party a flat rate clause and a clause providing for payment on a sliding scale based on more than 50% of the excess profits. In doing so it would be fixing the 'charter hire reserved in the charter' and it would be required by section 709(a) to insert in the charter another profit sharing clause in the statutory form to provide that any excess profits produced by the flat rate clause and the sliding scale clause would be 'additional charter hire' and divided fifty-fifty."

The Government may not now rely upon something that never happened, upon an administrative determination never made, even if it be assumed that such a determination would have been permissible under Section 5(b), Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed. 365. Hence, the issue is: What did Maritime actually do—not what Maritime could have done.

From a study of the voluminous evidence submitted, the conclusion is inescapable that Maritime fixed the basic charter hire at the 15 percent rate specified in Section 5(b),[13] and increased the recapture provisions specified in Section 709(a) for the purpose of creating a combined rate which it thought consistent with the policies of the 1946 Act. Inasmuch as Maritime exhausted its powers under Section 5(b) when it fixed 15 percent per annum of the statutory sales price as the basic rate and Section 709(a) provides a maximum rate of additional charter hire, that portion of Clause 13 providing for recapture in excess of the 50 percent rate was unlawful. Dichman, Wright & Pugh, Inc. v. United States, supra; United States v. East Harbor Trading Corp., 190 F.Supp. 245 (S.D.N.Y.); American Export Lines, Inc. v. United States, 290 F.2d 925, 932 (Ct.Cl.), wherein it is said:

"It was the Commission's duty to comply with the law, and no provision of the charters in violation of the statutory requirements has any validity."

■ Chartering authority under the 1946 Act expired on December 31, 1947, but was thereafter extended annually on five occasions. For the purpose of clothing Maritime's action with legality, the Government contends that Congress knew of Maritime's practice of computing additional charter hire on a sliding scale basis at the time of each extension and thus impliedly adopted such practice in the several reenactments. The Committee Reports of each House do indicate that there was testimony concerning the sliding scale. However, the Court has not been directed to any portion of the record, nor has extensive independ-

13. Maritime considered increasing the basic charter hire rate of 15 percent per annum of the statutory sales price but did not do so because of protests from other governmental agencies, the Army and the State Department. These agencies had sub-time/voyage/space charters with various operators containing escalation clauses providing that if the operators' basic hire was increased by Maritime, the rate of hire specified in the sub-charter would be adjusted accordingly.

**164**

ent study revealed any evidence indicating that Congress, or any Committee thereof, was ever advised of charterers' protests of illegality or that the sliding scale computation was being used as a substitute for and in violation of Section 709(a). Consequently, I find no merit in the contention. Dichman, Wright & Pugh, Inc. v. United States, supra; Fishgold v. Sullivan Drydock & Repair Co., 154 F.2d 785, 790 (2nd Cir.), affirmed 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230; Pacific Power and Light Co. v. Federal Power Commission, 87 U.S.App. D.C. 261, 184 F.2d 272, 275, wherein it is said:

> "At best the reenactment of statutes is a nebulous foundation for statutory construction, and before a mere reenactment can be given conclusive effect as a congressional adoption of an administrative interpretation, it must be shown that Congress was conscious that it was doing so."

Reenactment of a statute is not presumed to include agency interpretation which is inconsistent with or in violation of the Act as it existed prior to such reenactment, National Labor Relations Board v. Globe Automatic Sprinkler Co. of Pennsylvania, 199 F.2d 64 (3rd Cir.).

By way of a second and third line of defense the Government argues: (1) The preliminary payments of additional charter hire were voluntarily made and libelants are now estopped to assert illegality, but (2) if the Court holds otherwise, the Government is nevertheless entitled to recover on a quantum valebat basis. These assertions are likewise lacking in merit. Sword Line, Inc. v. United States, supra; American Export Lines, Inc. v. United States, supra; United States v. Moore-McCormack Lines, Inc., supra.

The Griffiths and Olympic cases are continued to January 15, 1963, for hearing on the issues peculiar thereto, at which time findings, conclusions and judgment incorporating the views herein expressed may be presented in American Mail.