**BLACK DIAMOND STEAMSHIP CORP.,**
Libelant,

v.

**UNITED STATES of America,**
Respondent.

**UNITED STATES of America,**
Cross-Libelant,

v.

**BLACK DIAMOND STEAMSHIP CORP.,**
Cross-Respondent.

**Adm. No. 3885.**

United States District Court
D. Maryland.

July 31, 1964.

———◇———

Galland, Kharasch & Calkins, Washington, D. C., and Robert H. Williams, Jr., Baltimore, Md. (Robert N. Kharasch, Washington, D. C., advocate), for Black Diamond Steamship Corp.

Thomas J. Kenney, U. S. Atty., Baltimore, Md. (Lawrence F. Ledebur, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., advocate), for the United States.

THOMSEN, Chief Judge.

The libel of Black Diamond Steamship Corp. (Black Diamond) seeks to recover $726,937.47 paid as "additional charter hire" for the use of government vessels under Contract No. MCc-41815 during the period September 1946 to August 1949. The libel is founded on two claims: first, a "cumulation" claim, which asserts that such additional charter hire should be calculated on Black Diamond's net profits cumulated over the entire period of the contract; and second, a "sliding scale" claim, which asserts that additional charter hire due should be calculated at the rate of 50% of the profits and not at the higher rates imposed by the Maritime Commission.

The government's answer denies the validity of both claims and contends that both are time-barred. Its cross-libel asserts that Black Diamond is indebted to it in the amount of $28,252.04, or, alternatively, on *quantum valebat*, for a much larger sum.

Both sides agree that there is no genuine issue of material fact, and each party has moved for summary judgment. Those motions originally presented five issues for decision by this court, but the parties are agreed that two recent opinions, one by the Fourth Circuit and one by the Supreme Court, have determined how three of those issues must be decided. Those issues are:

I. "Cumulation." Whether, in the computation of "additional charter hire", Black Diamond has the right to cumulate its profits and losses over the entire period of the contract, rather than treat each year as a separate accounting unit. In United States v. Moore-McCormack Lines, Inc., 4 Cir., 308 F.2d 866 (1962), cert. den. 372 U.S. 944, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963), it was decided that the Maritime Commission erroneously interpreted sec. 709(a) of the Merchant Marine Act, 1936, 46 U.S.C.A. § 1199(a), as prohibiting the averaging of profits and losses over the entire contract period. That decision establishes the right of Black Diamond to "cumulate"

the profits and losses involved in this case, subject to (a) the provisions of the "Foreign Trade Addendum" (see II, below) and (b) the time-bar defense (see V, below).

II. "Foreign Trade Addendum." In Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268, the Supreme Court held valid the so-called "Foreign Trade Addendum", which permits the government to require two separate cumulations, one before September 1, 1947, and one after September 1, 1947, as a result of a modification of the contract made in 1947.

III. "Sliding Scale." The same Supreme Court case held that the Maritime Commission had the power under sec. 5(b) of the Merchant Ship Sales Act of 1946 to impose and collect a sliding scale of additional charter hire, and that sec. 709(a) of the Merchant Marine Act, 1936, does not negate that authority. That means that the government had the right to collect from Black Diamond additional charter hire on the sliding scale called for by the contract, and disposes of Black Diamond's second claim, referred to in the first paragraph of this opinion.

Two issues remain:

IV. "Time-Bar." The government's time-bar defense to Black Diamond's "cumulation" claim is still open. The time-bar defense to the "sliding scale" claim has become moot.

V. "World Market Charter Rates." Also open is the government's cross-claim based on its claimed right to charge "World Market Charter" rates.

*Facts—Time-Bar*

1. Black Diamond operated ships under contract MCc-41815 from September 26, 1946 until August 13, 1949. Throughout that period, Black Diamond made regular payments of "basic charter hire". In addition, in accordance with Maritime Commission requirements, Black Diamond made "preliminary payments" of "additional charter hire".

2. Contract MCc-41815 contains, in clause 13, language required by sec. 709

(a) of the Merchant Marine Act, 1936, which was quoted by the Fourth Circuit in Moore-McCormack, 308 F.2d at 868 et seq.[1] Clause 13 continued: " \* \* \* The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire \* \* \* at such times and in such manner and amounts as may be required by the Owner; provided, however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."

3. Operations in the years 1946 and 1947 were profitable; operations in 1948 and 1949 resulted in losses.

4. "Preliminary payments" of "additional charter hire" were made to the Maritime Commission in accordance with Supplement 8 to General Order 60, a regulation issued by the Commission on October 29, 1946. Neither this regulation nor Contract MCc–41815 dealt specifically with cumulation of profits and losses over the term of the charter.

5. Black Diamond's last preliminary statement was submitted to the government on April 24, 1950. Its last preliminary payment of additional charter hire accompanied an earlier preliminary statement in June 1948. None of the preliminary statements were based upon Black Diamond's present "cumulative" theory, and none referred to a possible "cumulative claim".

6. The Maritime Commission did not publish any regulations governing the method of settling accounts until the issuance of Supplement 21 to General Order 60 on March 30, 1950.[2]

7. Accounting under Contract MCc–41815 and Maritime Commission regulations is highly complex; various questions were raised by Black Diamond and answered by the District Comptroller of the Maritime Commission during 1950 and 1951.

8. On November 28, 1950, the District Comptroller wrote Black Diamond as follows:

"At a recent conference in your office you advised our Mr. T. Conroy that your final accounting pursuant to the provisions of Supplement 21 to General Order 60 has been prepared, however, before submitting such accounting to this office you desired information as to the handling of adjustments in connection with expendable equipment inventories, unsettled claims, and other liabilities applicable to the bareboat operations which may be recorded subsequent to the date of your final accounting.

"As regards items of this nature, it is suggested that you submit the accounting required under General Order 60, Supplement 21, with the

1. "(a) Every charter made by the Secretary of Commerce pursuant to the provisions of sections 1191–1204 of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Secretary, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum. *Provided,* That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

2. Supplement 21 was itself further amended on January 8, 1951 and June 8, 1951, but those amendments do not affect the point at issue here. Supplement 21 provided that operating losses could be carried forward from one period to another for purposes of cumulation, but not operating profits. Black Diamond did not challenge this regulation until 1955.

reservation that such accounting will be subject to adjustment if, and to the extent required as a result of (1) subsequent decisions with respect to any items pending with the Maritime Administration (2) subsequent adjustments in connection with unsettled claims and (3) subsequent establishment of any liabilities which have not as yet arisen, which would affect such accounting.

"The certification required in Part VI of the procedure prescribed in Supplement 21 to General Order 60 may be modified to indicate that the accounting covered thereby is subject to subsequent adjustment with respect to the aforesaid items."

9. On December 13, 1950, Black Diamond replied, referring to specific items that might require a supplementary accounting, and asked for instructions with respect thereto. None of the items referred to any possible "cumulation" claim.

10. On January 26, 1951, the District Comptroller replied to Black Diamond's letter, reiterating what he had said in his letter of November 28, 1950, and concluding:

"The Administration realizes that certain adjustments may have to be made subsequent to the date of the final accountings under Supplement 21 to General Order 60, which will require the Charterer to revise its statements and submit supplementary Accountings, therefore, your Accountings should be submitted with the reservation suggested in our letter of November 28, 1950, as soon as possible."

11. On May 14, 1951, the District Comptroller sent a form letter to all Bare-boat Charterers, which read in part as follows:

"Where a voucher check is tendered by the Charterer, it is requested that no reference be made thereon through restrictive legend or otherwise to the effect that it is a final settlement. The accompanying let-ter of transmittal should state that the remittance is *on account* of additional charter hire due the Maritime Administration and is subject to adjustment upon the completion of final accounting between the Charterer and the Maritime Administration and that neither the tender of such payment by the Charterer, nor its acceptance by the Maritime Administration shall be construed as an approval of the correctness of the amount thereof, nor as a waiver of the rights or remedies of either party under the terms of the agreements involved or otherwise."

This is the letter referred to in footnote 10 to the Moore-McCormack opinion, 308 F.2d at 871.

12. A letter from Black Diamond to the District Comptroller, dated June 15, 1951, inquired about the "types of expenses" which had been the subject of Black Diamond's December 13, 1950 letter, but still made no reference to any "cumulation" claim. No reply to the June 15, 1951 letter is in the record.

13. On August 31, 1951, Black Diamond submitted a "final accounting" running through July 1, 1951, which was audited by the Maritime Commission on February 27, 1952. Neither in that "final accounting" nor in any previous communication with the Maritime Commission did Black Diamond question the legality of the Commission's regulation referred to in Finding 6 above, or make any other contention similar to its "cumulation claim":

14. On September 22, 1952, the Chief, Division of Audits, Maritime Commission, wrote Black Diamond as follows:

"With respect to the subject accountings, you are advised that the reports dated February 27, 1952 (Copy No. 5 attached) have been approved, and it has been determined that additional charter hire amounting to $1,376,239.88 has accrued to the Maritime Administration as a result of your operations under the

subject bareboat charter agreements.

\* \* \* \* \* \*

"The revised accountings are subject to further adjustment to take into account (a) applicable items recorded subsequent to June 30, 1951, (b) adjustments, if any, with respect to claims expense totaling $15,615.41 for which amount an accrual has been provided, (c) any recoveries, through pending legal action, of expenses charged with respect to SS BLUE JACKET, (d) the overages and shortages of expendable equipment, and (e) any errors or omissions later developed.

"If your payments on account of additional charter hire exceed the total amount accrued to the Administration as shown in the attached revised accountings, you may submit a claim for refund of the excess payments in the form of a Public Voucher as provided in Supplement 21, to General Order 60."

15. In order to calculate the *exact* amount due for additional charter hire, whether under a "cumulative" accounting, as approved in Moore-McCormack, or under the accounting method prescribed by the regulations and followed by Black Diamond in its 1951 accounting, it is necessary to know the final results of all operations during all years of the charter or charters. Between July 1, 1951 and February 15, 1956, Black Diamond paid out almost $200,000.00 in transactions relating to operations under Charter MCc–41815 and also received scores of payments relating to that contract. The record does not show what items may have been paid or received by Black Diamond since February 15, 1956. The last bookkeeping adjustment made by the Maritime Commission with respect to Black Diamond's charter accounts by way of mutually agreed refunds and transfers of funds was effectuated on January 6, 1954.

16. On August 9, 1955, Black Diamond submitted accountings which included the results of all transactions relating to its Contract MCc–41815 through May 31, 1955, and for the first time calculated a sum due Black Diamond in accordance with its "cumulation" theory. The Maritime Administration refused the claim, and returned the account to Black Diamond, retaining, however, two copies of the accountings.

17. On September 28, 1955, the Maritime Administration audited Black Diamond's accountings of August 1955.

18. Black Diamond's libel herein was filed on November 23, 1956.

### Discussion—Time-bar

This suit was brought by Black Diamond under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., which provides, in sec. 745, that suits may be brought thereunder "only within two years after the cause of action arises". The question therefore is, when did Black Diamond's cause of action arise.

Only one case in which that question was either decided or discussed in connection with a "cumulation" clause has been cited or found. That is American Eastern Corp. v. United States, S.D.N.Y., 133 F.Supp. 11 (1955), aff'd per curiam, 2 Cir., 231 F.2d 664 (1956), cert. den. 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497. In that case Judge Walsh said: "To the extent that libelant claims under the charter, its claim had arisen by June 16, 1948, when it returned the last of its ships to respondent. At that point all facts upon which its claim is based had occurred. Profits had been earned; losses incurred; preliminary payments had been paid. Thereafter it was merely a matter of computation to determine the amount of excess preliminary payments to which libelant was entitled. Delay in computation on the hope that respondent will compute upon the basis libelant believes correct does not toll the statute. Cf. Corporation of Royal Exch. Assur. v. United States, 2 Cir., 75 F.2d 478, 480; United States v. Sligh, 9 Cir., 24 F.2d 636, 638, reversed on other grounds 1928, 277 U.S. 582, 48 S.Ct. 600, 72 L.Ed. 998.

"There was no open account between the parties as contended by libelant,

wherein the claim arises with the last entry because previous entries are regarded as offsets to each other. Here there was no two-way trade but merely a one-way account for charter-hire with periodic payments. See Spring v. Gray, 1832, 6 Pet. 151, 164, 31 U.S. 151, 164, 8 L.Ed. 352. The complexity of the computation of these payments did not alter the nature of the account.

"No provision of the statute or charter required libelant to await the promulgation of regulations for final accounting before commencing its action. If it had in fact overpaid and was entitled to return payments under the charter no regulation of the Commission could bar the right and none was necessary to round it out. Neither was it necessary for libelant to await the outcome of claims presented through administrative channels. Cohen, Goldman & Co. v. United States, 1933, 77 Ct.Cl. 713, 730, certiorari denied 1933, 290 U.S. 681, 54 S.Ct. 119, 78 L.Ed. 587; Moriarty, Inc., v. United States, 1942, 97 Ct.Cl. 338, 339; Withers v. United States, 1930, 69 Ct.Cl. 584, 587.

"To the extent libelant claims for money had and received, its claim was mature when respondent, through the Maritime Commission's regulations for final accounting, unequivocally asserted its intent to withhold the money now claimed by libelant. These regulations were promulgated on February 21, 1950. The outline of procedure incorporated therein expressly stated that profits could not be offset by losses incurred in subsequent accounting periods. The language is as follows:

" 'In providing for the calculation of additional charter hire based on the *cumulative* net voyage profit of the Charterer, Clause 13 of Part II of Shipsales-demise 303 provides also that such *cumulative* net profit so accounted for shall not be included in the calculation of cumulative net profit in any subsequent year or period. Pursuant to these provisions of the bareboat charter agreements, *only* deficiencies in net voyage profits may be carried forward, and then

only under the following conditions:' (Emphasis in original) 46 C.F.R. § 299.37–4(C) (2).

More than two years have run since the promulgation of this regulation." 133 F.Supp. at 14–15.

The time-bar point was not involved in the Moore-McCormack case, because that was an action by the government to collect additional charter hire. The Court held that Moore-McCormack was not estopped to raise the cumulation theory as a defense, but that is a different question from the question presented in this case.

There are a few cases in which the time-bar question was discussed and decided in connection with claims based on the "sliding scale" issue, and in connection with other allegedly illegal exactions. The matter was very fully discussed in three separate opinions filed by judges of the Second Circuit who sat in American Foreign Steamship Corp. v. United States, 2 Cir., 291 F.2d 598 (1961). See also American President Lines, Ltd. v. United States, D.Del., 162 F.Supp. 732, 739–742 (1958), aff'd 3 Cir., 265 F.2d 552, 553 (1959); Luckenbach S. S. Co. v. United States, Ct. Cl., 292 F.2d 913, 916–917 (1961); Isthmian Steamship Co. v. United States, S.D.N.Y., 191 F.Supp. 335, 337 (1957), aff'd per curiam, 2 Cir., 302 F.2d 69 (1962); and American Mail Line, Ltd. v. United States, W.D.Wash., 213 F.Supp. 152 (1962). Some of the possible dates discussed in those cases are not applicable to the facts of this case, e. g., the date the contract was made, which might control a claim based upon the inclusion of an illegal clause in a contract, but has no application to a cumulation claim, which is a matter of accounting and depends upon the results of all operations during the entire period of the contract. United States v. Moore-McCormack Lines, supra. Cf. American Foreign Steamship Co. v. United States, supra.

In addition to the points decided in its favor in the American Eastern Corp. case, supra, the government relies on the provisions of clause 13 of the contract in

support of its contention that the cause of action arose not later than February 27, 1952, when the government audited the "final accounting" submitted by Black Diamond on August 31, 1951. The pertinent parts of clause 13 quoted above in Finding 2, indicate that Black Diamond's right to refunds arose "at the time of the rendition of preliminary statements" by Black Diamond or "upon the completion of each final audit" by Maritime.

Black Diamond's last preliminary statement was submitted on April 24, 1950; its last payment of additional charter hire accompanied an earlier preliminary statement of June 1948. Black Diamond could have raised its "cumulation" claim at the time its last preliminary statement was submitted in April 1950, but it did not do so. Although that date might be considered the date on which a "sliding scale" claim or similar cause of action arose, see American Foreign Steamship Corp. v. United States, supra, it cannot properly be held the date on which the "cumulation" claim involved in this case arose, in view of the nature of the claim as described by the Fourth Circuit in United States v. Moore-McCormack Lines, where the Court said:

> "This interpretation of the statute would treat each annual report and each payment on account of additional charter hire as tentative, for what, if any, additional charter hire ultimately will be found to be due, cannot be determined until after

expiration of the charter. Clause 6(b) of the charter, however, specifically provides that they are. Payments of additional charter hire are preliminary and subject to adjustment until the rendition of a preliminary statement or the completion of a final audit, at which time the charterer must pay such additional charter hire as may be due and any overpayment will be refunded to the charterer 'as may be required'." [3] 308 F.2d at 871.

The accounting which Black Diamond filed in August 1951 purported to be a "final accounting", subject to minor debits and credits for items which were paid or received thereafter. The audit of that "final account", which was made by the Maritime Commission in February 1952 was a final audit within the meaning of clause 13.

Since clause 13 referred to "each final audit" (emphasis supplied), it is clear that the possibility of more than one "final audit" was contemplated. While the term "final audit" was not defined in either the charters or the regulations, it seems clear that the term applies to a formal audit of a "final accounting". The latter term is defined in Supplement 21 to General Order 60.[4]

Despite the reference in clause 13 to "each final audit", Black Diamond argues that clause 13 contemplated only one final audit, and contends that the audit of the "revised accounting" which Black Dia-

3. In a footnote to the quoted paragraph the Fourth Circuit said:

"The final audit to which Clause 6(b) of the charter refers, may well be one final audit of all operations under the charter made after its expiration. On the limitations questions, that was the position of the shipping companies in the cases reported sub nom. American-Foreign Steamship Corporation v. United States. And see Maritime's circular letter quoted by Judge Hincks in footnote 4 of his opinion for the majority of the first en banc court. 265 F.2d at 145."

The circular letter will be discussed below, in connection with the audit of the "final accounting" filed by Black Dia-

mond in August 1951. It does not appear that the Fourth Circuit was attempting to rule on the question of limitations; particularly it was not ruling on the effect of clause 13 in the Black Diamond contract, particularly with reference to "each final audit".

4. Sec. 299.37–2(b) (1) of Supplement 21 (15 Fed.Reg. 1790) required the charterers "to submit a separate final accounting of additional charter hire * * * for each annual or overall accounting period under SHIPSALES-DEMISE 303 and addenda thereto". Sec. 299.37–2(c) (1) required submission of a "revised accounting" covering charter operations subsequent to December 31, 1949, and any adjustments to prior accountings.

mond submitted on August 9, 1955, covering items recorded on its books through June 30, 1955, was the "final audit" which started limitations running. But even that audit would not be "final" in the sense for which Black Diamond argues, because the evidence shows that additional items were recorded as late as March 1956, and it does not appear that they were the last. Such additional items call for further auditing, formal or informal. To hold that only a last, never-thereafter-subject-to-revision audit satisfies the "each final audit" language of clause 13, would frustrate the purpose of the statute of limitations.

In the course of the oral argument at the last hearing, Black Diamond's attorney admitted that the February 1952 audit would have been a final audit which started limitations running if it had not been for the agreement contained in the correspondence between Black Diamond and the Maritime Commission set out in paragraphs 8 through 12 and 14 of the Findings of Fact.

■ These letters indicate clearly that the parties agreed to keep the accountings open for new debits and credits resulting from items paid or received by Black Diamond after the date of the "final accounting" filed in August 1951, which was audited in February 1952, and for similar adjustments. But there is nothing in the letters which permits Black Diamond to raise for the first time, four or more years later, a claim based not upon any such debits and credits, or adjustments, but upon an entirely new theory, attacking the method of accounting prescribed by a regulation already promulgated in 1950 and followed without protest by Black Diamond in the preparation of its "final accounting" in 1951. The letters cannot and do not extend the time within which Black Diamond might file suit on such a claim.

The following paragraphs from the opinion in American Eastern Corp. v. United States, supra, apply directly or by analogy:

"Libelant asserts that respondent's position was not unequivocal because of certain reservations in other provisions of the procedure for final accounting reserving the Commission's right to deviate from its formula for the calculation and allocation of capital and income where necessary to avoid an inequity. This does not establish that the regulations were in any sense tentative. This reservation was inherent in the complexity of the subject matter, the inability to prescribe a formula which would do justice in every case. It was not the deferment of the interpretation of the charter. Further, the matter affected by such reservations did not concern the basis for the present claim and, in any event, the reservations were of such a general nature that they could not diffuse the effect of the precisely expressed proscription against offsetting profits by subsequent losses.

\*   \*   \*   \*   \*   \*

"The labyrinthine aspects of the charter and regulations which libelant has seen fit to exaggerate are really only superficial. They are to be expected in any administrative attempt to deal with a complex subject matter on a mass scale. Care must be taken not to permit their seeming complexity to confuse the elementary simplicity of the dealings between the parties." 133 F.Supp. at 16.

In the instant case this Court concludes that the cause of action on the "cumulation claim" arose not later than 1952, when the "final accounting" which Black Diamond filed in August 1951 was audited by the Maritime Commission. Since this action was not filed until November 1956, it is barred by the two-year limitations provision in the Suits in Admiralty Act.

### World Market Charter Rates

■ The government claims that the Maritime Commission should not have allowed Black Diamond to pay a rate less than the "world market charter rate". It relies on the language of sec. 5(b) of the Ship Sales Act, 60 Stat. 41, 50 U.S.C.

App. § 1738,[5] to support this contention. Although the meaning of the language in the statute is not free from doubt, the four courts which have passed on the question have been unanimous in denying the government's claim. Dichman, Wright & Pugh v. United States, S.D. N.Y., 144 F.Supp. 922 (1956); United States v. East Harbor Trading Corporation, S.D.N.Y., 190 F.Supp. 245 (1960); American Export Lines, Inc. v. United States, Ct.Cl., 290 F.2d 925 (1961); and Massachusetts Trustees of Eastern Gas and Fuel Associates v. United States, D. Mass., 202 F.Supp. 297 (1962). This Court agrees with the conclusion reached in those cases.

Counsel will prepare an order giving effect to the foregoing opinion.

5. Sec. 5(b) provides:
"The charter hire for any vessel chartered under the provisions of this section shall be fixed by the Commission at such rate as the Commission determines to be consistent with the policies of this Act, but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter). Except in the case of vessels having passenger accommodations for not less than eighty passengers, rates of charter hire fixed by the Commission on any war-built vessel which differ from the rate specified in this subsection shall not be less than the prevailing world market charter rates for similar vessels for similar use as determined by the Commission."